(58)                                                          1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    ----------------------------------------------

4    UNITED STATES OF AMERICA

5

6

7

8       -versus-                              04-CR-402

9                          **(DETENTION HEARING)**

10

11   YASSIN MUHIDDIN AREF

12   and MOHAMMED MOSHARREF HOSSAIN

13

14                   Defendants.

15   ----------------------------------------------

16

17              TRANSCRIPT OF PROCEEDINGS held in and for

18   the United States District Court, Northern District of

19   New York, at the James T. Foley United States Courthouse,

20   445 Broadway, Albany, New York  12207, on TUESDAY,

21   AUGUST 10, 2004, before the HON. DAVID R. HOMER,

22   United States District Court Magistrate Judge.

23

24

25

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

2

1

2    **APPEARANCES:**

3

4

5    FOR THE GOVERNMENT:

6    HON. GLENN SUDDABY, United States Attorney - NDNY

7    BY:  DAVID M. GRABLE, Assistant U.S. Attorney

8    BY:  GREGORY WEST, Assistant U.S. Attorney

9

10

11

12   FOR THE DEFENDANT AREF:

13   BY:  TERENCE E. KINDLON, ESQ.

14

15   FOR THE DEFENDANT HOSSAIN:

16   BY:  KEVIN A. LUIBRAND, ESQ.

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

UNITED STATES v AREF and HOSSAIN                    3

1    (Court commenced in chambers at 2:03 PM.)

2    (Discussion off the record.)

3         THE CLERK:  United States of America versus

4    Yassin Mohammed Aref and Mohammed Mosharref Hossain,

5    04-CR-402.

6         Can we have appearances for the record.

7         MR. GRABLE:  Dave Grable and Gregory West

8    appearing on behalf of the United States.  Good afternoon,

9    your Honor.

10        MR. KINDLON:  Terence Kindlon, 74 Chapel

11   Street, Albany, on behalf of the accused.  Good afternoon,

12   sir.

13        THE COURT:  The record should reflect that

14   we're in chambers to discuss a matter that's just been

15   raised.  Mr. Grable, if you could repeat what you just told

16   me off the record.

17        MR. GRABLE:  Sure.  Your Honor, the

18   Government wanted to speak with the Court beforehand with

19   Mr. Kindlon here because we had some concerns about a

20   potential conflict issue and just wanted to make sure that

21   it didn't raise problems down the road.

22        It's our understanding that Mr. Kindlon

23   himself served in the U.S. military and has relatives

24   currently serving in the U.S. military.  We had heard

25   through the rumor mill that he had a son who was serving or

UNITED STATES DISTRICT COURT REPORTER - NDNY
BONNIE J. BUCKLEY, RPR

UNITED STATES v AREF and HOSSAIN                    4

1    served in Iraq, but I spoke with him before coming here and
2    he disabused me of that notion.

3                    THE COURT:  Mr. Kindlon did.

4                    MR. GRABLE:  Yes.  And he should explain
5    fully I think the nature of his relatives and the
6    relationship with the military.  Our concern here is that,
7    as has been disclosed in a search warrant affidavit that has
8    now been unsealed, this defendant's name was found in an
9    address book that was recovered by U.S. forces following a
10   raid on a terrorist camp in northern Iraq, and our concern
11   is that we would certainly like to make sure that the
12   defendant understands, at least if there is a conflict
13   issue, the relationship there, and executes or makes some
14   sort of waiver just to avoid problems down the road.

15                   THE COURT:  Mr. Kindlon.

16                   MR. KINDLON:  I thank Mr. Grable for an
17   excess of caution.  And I suspect what the source of the
18   concern is arises from the fact that I have one son who's a
19   lawyer and a Captain in the United States Marine Corps right
20   now, but he's stationed in Camp Lajeune, North Carolina, and
21   as of last week was informed that it is unlikely he's going
22   to be deployed any time soon.  I have another -- that son is
23   Lee Kindlon; he's 28 year old.  I have an older son, Gordon
24   Kindlon, who's my adopted son actually, and he is 33 years
25   old, and for much of last year and until April 1st of 2004,

1   he was working with an NGO, non-governmental organization,

2   called Mercy Corp in southern Iraq.  On April the 1st of

3   2004, he took new employment with the United Nations and

4   that employment is in Afghanistan which is where he's

5   currently stationed.  And his contract with the UN to be in

6   Afghanistan terminates, I believe, at the end of October.

7   And he has told his mother and me that it is his intention

8   at that time to return to the United States.

9                Now, I do have a, I do have a cousin who has

10  a son who enlisted in the Marine Corps a year or two ago.  I

11  haven't heard anything about him.  I don't know where he is.

12  I don't know what he's doing.  So -- and I don't know, I

13  don't know the fellow, I've never met him in my life.  I

14  heard through the family grapevine he was...

15                THE COURT:  Mr. Grable, what relief do you

16  seek or procedure are you recommending?

17                MR. GRABLE:  I think it would be sufficient

18  if the defendant were informed of the family relationships

19  or relatives that Mr. Kindlon has, at least this one, the

20  son who's currently in the Marine Corps and perhaps the

21  cousin with the son.  I don't know what you call that.  A

22  cousin once removed.

23                MR. KINDLON:  I guess.  I don't know.

24                MR. GRABLE:  I don't know the answer to that.

25                MR. KINDLON:  I couldn't pick him out of a

UNITED STATES v AREF and HOSSAIN                    6

1   line-up, quite frankly.

2                 MR. GRABLE:  If the defendant could have a

3   communication perhaps with Mr. Kindlon and otherwise have

4   something put on the record indicating that he understands

5   this familial affiliation.  And it's my understanding, Mr.

6   Kindlon, that you served in the -- you were a decorated

7   veteran in the military during the Vietnam --

8                 MR. KINDLON:  The reason that came up was

9   because somebody called my office and said I wasn't much of

10  an American because I was representing...

11                MR. GRABLE:  I'm not saying it came up in

12  this case.  I know that it came up before; I know you served

13  this country.  And I think it's also worthwhile to have the

14  defendant -- unless the Court thinks I'm out in left field

15  here -- have the defendant understand that and say I

16  understand all that and it does not concern me, doesn't

17  cause me any concern about Mr. Kindlon's ability to

18  zealously represent me in this case.

19                THE COURT:  I think it's close to left field

20  but I understand the abundance of caution that you bring to

21  the issue.

22                Mr. Kindlon, what's your thought?  I'm torn

23  being doing nothing and leaving it to you to talk to your

24  client first and then having you proceed in a week or so.

25                MR. KINDLON:  I will advise him.  With all

1    objectivity, it strikes me as truly excessive caution.  The

2    fact is, as I understand it, that was an Army -- a U.S. Army

3    unit that made the raid.  The Marine Corps wasn't even

4    involved.  Whatever that may be worth.

5            THE COURT:  Well, it sounds to me like

6    there's no basis for believing there's any connection

7    between the notebook or whatever it was that was seized in

8    the northern Iraqi camp and any member of the Kindlon

9    family, is what Mr. Kindlon is telling me.

10           MR. KINDLON:  That's exactly what I'm saying,

11   yes.

12           THE COURT:  There's no connection there.  Now

13   we're talking about whether or not there's a potential

14   conflict which may arise either from Mr. Kindlon's past

15   military service or the military service or government

16   service of a child; is that where we are?

17           MR. GRABLE:  Yes, your Honor.

18           THE COURT:  If there were an issue related to

19   the seizure of the notebook, I think we probably would have

20   to talk about something because the potential would be

21   witness issues and so forth.  The other conflict I'm

22   missing.

23           MR. KINDLON:  Then I guess -- excuse me.  I'm

24   sorry.  That notebook was seized when?

25           MR. GRABLE:  June of 2003.

1          MR. KINDLON:  June of 2003.  I think my son

2    Captain was still in Quantico, Virginia going through what

3    they call the basic school down there.

4          THE COURT:  But I also don't want to open the

5    door for any future litigation and issues I don't see.  And

6    so I'm -- in an abundance of caution, we can probably put

7    this on the record, I suggest we do it on a different day to

8    give Mr. Kindlon a chance to talk to his client about it

9    first, and then we'll have him brought in on some occasion

10   and put it on the record.

11         MR. KINDLON:  Will do, Judge.

12         THE COURT:  As I understand it -- is there

13   anything else on the record?

14         MR. GRABLE:  No.

15         THE COURT:  Off the record.

16         MR. GRABLE:  Thanks, Judge.

17         (Discussion off the record.)

18         (Adjourned in chambers at 3:15 PM.)

19         (In open court at 3:17 PM.)

20         THE CLERK:  United States of America versus

21   Yassin Muhiddin Aref and Mohammed Mosharref Hossain,

22   criminal docket number 04-CR-402.

23         Could we have appearances for the record,

24   please.

25         MR. GRABLE:  David Grable with Assistant U.S.

1   Attorney Gregory West, FBI Special Agents Tim Coll and

2   Laurie Youngblood, appearing on behalf of the United States.

3   Good afternoon, your Honor.

4              THE COURT:  Good afternoon.

5              MR. KINDLON:  Terence Kindlon, 74 Chapel

6   Street, Albany, New York, appearing on behalf of Yassin

7   Aref.  Good afternoon, your Honor.

8              THE COURT:  Good afternoon.

9              MR. LUIBRAND:  Good afternoon, Judge.  Kevin

10  Luibrand, for Mohammed Mosharref Hossain, from Tobin &

11  Dempf, 33 Elk Street, Albany, New York.

12             THE COURT:  Good afternoon.

13             Before we commence with the arraignment, Mr.

14  Kindlon, it's my understanding that your client is able and

15  willing to proceed without an interpreter today; is that

16  correct?

17             MR. KINDLON:  I've discussed this with him at

18  some length.  His English is good enough for him to

19  understand what's going on.  He does sometimes, when under

20  pressure, not understand things as well as somebody who grew

21  up in New Jersey might, but he is able to understand just

22  about anything.  And if there's any problem, I would advise

23  the Court and perhaps stop and go over it again.

24             THE COURT:  That's fine.  And if you would,

25  if you haven't already, advise your client of that fact.

1    Please interrupt if he needs additional time and needs to

2    consult about anything else.

3                    MR. KINDLON:  Yes, thank you, Judge, we've

4    discussed that.

5                    THE COURT:  Thank you.

6                    Mr. Hossain, it's my understanding that

7    you -- you may remain seated, Mr. Hossain, as long as you

8    can see me over the monitor.

9                    DEFENDANT HOSSAIN:  I can see you.

10                   THE COURT:  Mr. Hossain, it's my

11   understanding that you wish now to apply for the appointment

12   of counsel, is that correct?

13                   DEFENDANT HOSSAIN:  Yes, sir.

14                   THE COURT:  I have the financial affidavit

15   that you completed last week.  Did you sign that affidavit

16   at the bottom?

17        (Pause.)

18                   THE COURT:  Would you like to see it?

19                   DEFENDANT HOSSAIN:  Yes, your Honor.

20                   THE COURT:  Is that your signature at the

21   bottom?

22                   DEFENDANT HOSSAIN:  Yes, your Honor.

23                   THE COURT:  Is the information you provided

24   true and accurate to the best of your belief?

25                   DEFENDANT HOSSAIN:  It is, to my knowledge.

1           THE COURT:  Now, Mr. Hossain, based on your

2   financial affidavit, it appears that you, from what you say

3   you derive, about $10,000 a month in income from your

4   business and that you have expenses against that business of

5   $9,000, or a little over, which would be close to what we

6   would call a wash.  But it also appears -- which if that

7   were the only income and costs that you had against income,

8   you would clearly qualify for the appointment of counsel.

9   But it also appears from your affidavit that you own four

10  rental properties from which you receive rental income and

11  which you own free and clear of any liens or encumbrances;

12  is that correct?

13          DEFENDANT HOSSAIN:  Yes, your Honor.

14          THE COURT:  All right.  Based on what you

15  assess the value of those properties to be, it does appear

16  that you have assets from which to pay an attorney.  So

17  here's what I'm proposing.  I will appoint an attorney for

18  you, and it will be Mr. Luibrand.  I would require, however,

19  that you agree to forfeit property which -- and the

20  agreement will be held by the Court until the conclusion of

21  the case, at which time that property would be used to

22  reimburse the Government for the costs of the attorney that

23  is assigned to represent you.  I do this because it appears

24  from your affidavit that you do have assets which could be

25  used to defray the cost of an attorney.  Do you understand

UNITED STATES v AREF and HOSSAIN                    12

1    that?

2                DEFENDANT HOSSAIN:  Yes, your Honor.

3                THE COURT:  Do you have any questions about

4    it?

5                DEFENDANT HOSSAIN:  No, your Honor.

6                THE COURT:  Are you agreeable to doing that?

7                DEFENDANT HOSSAIN:  Yes, your Honor.

8                THE COURT:  All right.  I'm going to present

9    to you now an agreement to forfeit property and I'm going to

10   require that you put on that forfeiture two of the

11   properties that you own, which I believe would be sufficient

12   to reimburse the Government for any costs of the attorney

13   that's appointed to represent you.  If you have any

14   questions about it, you can consult with Mr. Luibrand who is

15   here with you and who is appointed to represent you.

16                Mr. Hossain, I take it you are the only named

17   owner on those properties?  Is your wife on the deed?

18                DEFENDANT HOSSAIN:  No, myself.  I provide

19   years and years, we call it my children's fund, and those

20   money I put it into a --

21                THE COURT:  I'm just concerned with whose

22   names are on the deed.

23                DEFENDANT HOSSAIN:  Mine.

24                THE COURT:  Then it only requires your

25   signature.

1        (Pause.)

2             THE COURT:  Since the initial appearances in

3   this case, I believe an Indictment has been returned for

4   purposes of arraignment.  Mr. Grable or Mr. West, can you

5   summarize the charges and the maximum penalties.

6             MR. GRABLE:  Yes.  Thank you, your Honor.  On

7   Friday of last week a grand jury handed up a 19 count

8   Indictment, a copy of which has been provided to both

9   defendants, charging them with multiple counts of money

10  laundering and multiple counts of attempted and conspiracy

11  to conceal what they believe was the source of material

12  support for a specified terrorism offense.

13             Summarizing the Indictment, Count 1 is a

14  money laundering conspiracy count that charges both Yassin

15  Muhiddin Aref and Mohammed Mosharref Hossain with conspiring

16  to commit the laundering money offense.  Counts 2 through 11

17  are substantive money laundering counts.  All of those,

18  Counts 1 through 11, carry a maximum term of incarceration

19  of 20 years, a maximum fine of $250,000, a maximum term of

20  supervised release of three years, and a mandatory special

21  assessment upon conviction of $100.

22             Count 12 of the Indictment is a conspiracy to

23  commit an offense under 18 USC Section 2339A.  That is the

24  provision that prohibits conspiring or attempting to conceal

25  the source of material support or resources for a specified

1    offense.   The specified offense in this case is the unlawful

2    use of a weapon of mass destruction in violation of 18

3    United States Code Section 2332(a).   Count 12 is a

4    conspiracy count, and Counts 13 through 19 are substantive

5    counts that follow up on that which occurred during the

6    course of the conspiracy.   The maximum penalty for all of

7    those 2339A counts are a maximum term of imprisonment of 20

8    years, a $250,000 fine, a maximum term of supervised release

9    of three years and a mandatory special assessment upon

10   conviction for each count of $100.

11                    THE COURT:   Thank you, Mr. Grable.

12                    Mr. Kindlon, have you received a copy of the

13   Indictment?

14                    MR. KINDLON:   Yes, sir.

15                    THE COURT:   Have you had adequate time to

16   discuss the case with Mr. Aref for purposes of arraignment?

17                    MR. KINDLON:   I have, your Honor.

18                    THE COURT:   Does Mr. Aref wish the Indictment

19   read to him or does he waive the reading?

20                    MR. KINDLON:   He waives the reading.

21                    THE COURT:   And how does he plead?

22                    MR. KINDLON:   Not guilty.

23                    THE COURT:   Mr. Luibrand, have you received a

24   copy of the Indictment?

25                    MR. LUIBRAND:   Yes, your Honor.

1           THE COURT:  Have you had adequate time,

2   adequate opportunity to discuss the case with Mr. Hossain

3   for purposes of arraignment?

4           MR. LUIBRAND:  Yes, your Honor.

5           THE COURT:  Does Mr. Hossain wish the

6   Indictment read to him or does he waive the reading?

7           MR. LUIBRAND:  Your Honor, we waive the

8   reading.

9           THE COURT:  And how does he plead?

10          MR. LUIBRAND:  Not guilty, your Honor.

11          THE COURT:  A not guilty plea has been placed

12  on behalf of Mr. Aref and Mr. Hossain.  A scheduling order

13  has been entered and is being provided to counsel at this

14  time setting forth the schedule for the progression of the

15  case.

16          Now, prior to today's proceeding, a matter

17  was brought to my attention which -- regarding Mr. Aref

18  which requires a further hearing.  Mr. Kindlon, I understand

19  you are going to be gone for a period of time.  During what

20  week would you be available?

21          MR. KINDLON:  I'll be gone as of this

22  Thursday and for all of next week, your Honor, returning the

23  next -- the following Monday, and I don't know what the date

24  is, I don't have a calendar.

25          THE COURT:  Looks like August 23, 24.

UNITED STATES v AREF and HOSSAIN                16

1           MR. KINDLON:  August 24 is perfect, Judge.
2           THE COURT:  August 24 at 2 PM.  Is that
3    agreeable with the Government?
4           MR. GRABLE:  Yes, your Honor.  Thank you.
5           THE COURT:  All right.  2 PM, August 24.
6           Now, matter also on for today is the
7    Government's motion for detention as to both Mr. Aref and
8    Mr. Hossain.  Is the Government ready to proceed?
9           MR. GRABLE:  Yes, we are, your Honor.
10          THE COURT:  Mr. Kindlon, are you ready to
11   proceed?
12          MR. KINDLON:  Yes, sir.
13          THE COURT:  Mr. Luibrand?
14          MR. LUIBRAND:  Could I have a moment, your
15   Honor?
16          THE COURT:  Yes.
17          (Pause.)
18          MR. LUIBRAND:  Yes, your Honor, we're ready.
19          THE COURT:  All right.  Thank you.  Mr.
20   Grable, I'll hear from the Government first.
21          MR. GRABLE:  Thank you, your Honor.  I'm
22   holding in my hand a pretrial services report which was
23   prepared following the interview with each of these
24   defendants, and the recommendation contained in both of the
25   pretrial services report is that both defendants be detained

1   pending trial because there is no condition or combination

2   of conditions that would reasonably ensure the defendants'

3   appearance in court or the safety of the community.  The

4   Government joins in these recommendations and asks the Court

5   to detain both of these defendants on both of those grounds;

6   that is, that their release would pose a risk of danger to

7   the community and a serious risk of flight.

8                   As the Court is well aware, there are four

9   factors that it needs to consider in determining whether to

10  release or detain a defendant pending trial.  Those factors

11  are set forth in 18 USC Section 3142(g).  The first two

12  factors are really linked in the sense that they deal with

13  the type of case and the strength of the evidence; the first

14  factor being the nature and circumstances of the offense

15  charged, the second factor being the weight of the evidence.

16  We submit, beginning with those two factors, that as to both

17  of these defendants, they strongly favor detention in this

18  case.  The Court is familiar with the affidavits that have

19  been submitted in support of the complaint that was issued

20  and search warrants that were issued in this case.  I'm

21  going to try not to recite every detail contained in those

22  affidavits, but we would ask that the Court incorporate

23  those by reference when considering the nature of the case

24  and the strength of the evidence in this case.

25                   As your Honor is well aware, this case

1   involves circumstances in which these defendants laundered

2   what they believed, were led to believe were the proceeds of

3   a missile sale to terrorists in New York City and that these

4   terrorists in New York City intended to use the missile for

5   a particular purpose; that is, an attack on a Government

6   official.

7              THE COURT:  Do any of the charges in this

8   case raise the presumption?

9              MR. GRABLE:  One of the charges in this case,

10   2339A, is a crime of violence, your Honor, under the Bail

11   Reform Act.

12             THE COURT:  Which count is that?

13             MR. GRABLE:  That's Count 12, the conspiracy

14   to commit, 2339A, and Counts 13 through 19, the substantive

15   2339A counts.

16             So you've got, you've got a crime of

17   violence, crimes in this case, and aside from that, Judge,

18   you have recurring criminal conduct, multiple transactions,

19   meetings and discussions, the vast majority of which were

20   captured on audio and videotape.  We submit that speaks

21   strongly to the weight of the evidence.  The complaint sets

22   forth -- the affidavit attached to the complaint sets forth

23   the detail, the nature of those conversations.

24             In general, going through sort of a summary

25   chronology, sometime in the summer of 2003 a cooperating

1    witness struck up a relationship with the defendant Hossain.

2    Soon after striking up that relationship, the defendant

3    Hossain asked the cooperating witness to assist Hossain's

4    brother in acquiring a fraudulent document.  The cooperating

5    witness performed the service and got the brother the

6    fraudulently obtained document.  During the course of those

7    meetings about that transaction, there was discussion about

8    religion, politics and other issues, there was discussion

9    about jihad, and the question was raised and discussed as to

10   whether money could be made through jihad.  During the

11   course of these conversations --

12            THE COURT:  What definition of jihad does the

13   Government assume here?

14            MR. GRABLE:  There were two definitions as

15   set forth in the complaint, two definitions or two forms of

16   jihad that were discussed.  There was this outer jihad that

17   was discussed; it was essentially phrased as a -- well, at

18   least to include the violent terrorist type attacks that I

19   think people see and hear about on the news.  And there was

20   also the in -- an inner jihad that was discussed, which

21   talks about essentially, I think, controlling one's own

22   desires and other matters like that.  As set forth in the

23   complaint affidavit, defendant Hossain during this time

24   period opined that now was not the time for the violent

25   outer jihad, but it was the time for the inner jihad.  And

1   that's all set forth in our complaint affidavit.

2                   But in the discussion of making money through

3   jihad and right around the same time the defendant Hossain

4   asked the cooperating witness for a loan, the opportunity

5   was opened up for the sting operation to begin.  And as set

6   forth in the complaint affidavit on November 1 -- on

7   November 20, 2003, the cooperating witness showed defendant

8   Hossain a shoulder-fired missile.  He had told defendant

9   Hossain in sum and substance --

10                  THE COURT:  Showed him the missile itself or

11  a photograph of the missile?

12                  MR. GRABLE:  He actually showed him the

13  missile.  With the Court's permission, I provided a copy to

14  Mr. Kindlon already, I'm handing a copy to Mr. Luibrand

15  right now, what's been marked as Government's Exhibit 1, I

16  would like to offer this for purposes of the detention

17  hearing.

18                  THE COURT:  It will be accepted for that

19  purpose.

20                  MR. GRABLE:  Government Exhibit 1 depicts a

21  November 20, 2003 meeting that was captured on hidden video

22  in which the cooperating witness is displaying to defendant

23  Hossain the shoulder-fired missile.

24                  During the course of that meeting, the

25  cooperating witness explained to defendant Hossain in sum

1   and substance that he imports this missile and other types

2   of equipment like that from China, that he provides it to

3   mujahid brothers down in New York City and he uses it for

4   hitting airplanes.

5              Sometime following that meeting, but before

6   December 3, 2003, Hossain reiterated his request that the CI

7   provide him with a loan.  On December 3, 2003, the

8   cooperating witness linked up that request to this missile

9   and proposed to defendant Hossain that he assist the

10  cooperating witness in laundering the $50,000 proceeds from

11  the importation and shipment of that missile down to New

12  York City.  The cooperating witness in a recorded

13  conversation, audio recorded only, not video recorded,

14  described again how he brought these -- brought this missile

15  into the United States to go down to New York City, to

16  jihadis in New York City and -- I believe the term that he

17  used in that conversation was jihadis -- and proposed that

18  Hossain take the $50,000 cash proceeds from this missile,

19  pay back the cooperating witness in monthly $2,000 payments

20  on checks that would make it appear as though the

21  cooperating witness had worked for Hossain.

22             In a meeting a couple of days later, on

23  December 5, 2003, the defendant Hossain in the course of a

24  conversation about having this transaction be performed in

25  accordance with the laws of Allah, the defendant Hossain

1   represented that a witness be part of the transaction, and

2   after the cooperating witness eliminated certain ethnic

3   groups from the pool of individuals that he wished to serve

4   as a witness in this case, the defendant Hossain recommended

5   co-defendant Yassin Aref and said that Yassin Aref could be

6   a witness and guarantor in this transaction.

7           After that December 5th meeting but before

8   the December 10th meeting, Hossain told the cooperating

9   witness in sum and substance that he had had some

10  conversation but just some minor conversation with Aref

11  about the laundering scheme and that on December 10th in a

12  recorded conversation, the cooperating witness met with the

13  defendant Hossain and defendant Aref and talked about this

14  proposal, about this laundering proposal, during which time

15  the defendant Aref recommended that the parties create a

16  receipt to further follow the laws of Allah, a receipt of

17  each transaction that was performed.  And although the

18  cooperating witness initially resisted, saying, amongst

19  other things, that he didn't -- or suggesting amongst other

20  things that he didn't want people to know where this money

21  came from, he eventually acquiesced and agreed to have

22  receipts generated.  And in a minute I'll get to where the

23  receipts come in.

24          Fast-forwarding approximately a month to

25  January 2 of 2004, when this scheme gets consummated, on

1   January 2, 2004, the cooperating witness met with Yassin
2   Aref and Mohammed Mosharref Hossain in his office.  And with
3   the Court's permission, I would like to hand up what's been
4   marked as Government's Exhibit 2 and we would like to offer
5   this for purposes of the hearing.  A copy has been provided
6   to Mr. Kindlon, and I'm providing a copy to Mr. Luibrand.
7   Government's Exhibit 2 is a still photo of the videotape of
8   that January 2, 2004 meeting in which the defendant Hossain,
9   who's pictured in the white cap, and defendant Aref, who's
10  pictured without a cap but with his -- I think it's pretty
11  clear from the picture it's defendant Aref sitting on one
12  side of the desk and the cooperating witness standing on the
13  other side of the desk and the cooperating witness holding
14  in his hands the trigger mechanism for this surface to air
15  missile.  During this meeting the cooperating witness again
16  went over the terms of the laundering deal, talked about
17  this piece of equipment, this trigger mechanism needing to
18  go down to New York City, and that when it did, he would get
19  the remaining $45,000 from the $50,000 he was getting for
20  bringing this piece of equipment in.  And they essentially
21  consummated the laundering deal in the sense that the
22  cooperating witness provided -- first attempted to provide
23  the defendant Hossain but being directed to provide to
24  defendant Aref $5,000 cash.  He provided the cash, on the
25  videotape, Aref counts out the cash and then hands it to

1    Hossain.  Following on, a receipt is generated in which all

2    three of the individuals signed the receipt simply talking

3    about the money owed from one person to another.  And

4    Hossain makes a check payable or at least says that he will

5    make a check payable to the cooperating witness' business.

6    The cooperating witness gives him a card so that Hossain can

7    see the business name that the check is supposed to be made

8    payable to.

9              THE COURT:  Does the use of receipts in an

10   alleged criminal conspiracy strike you as unusual and even

11   bizarre?

12             MR. GRABLE:  It does not, your Honor,

13   especially since it appears that the understanding was --

14   well, number one, that that's the way to do it according to

15   the laws of Allah and that's the way transactions are done

16   in this culture.  And number two, there was information or

17   at least the conversations suggest that the receipts weren't

18   going to be simply kept anywhere, but they would be kept by

19   Aref in a place -- not necessarily a secret place, but a

20   place that he would have secure and would be kept by the

21   cooperating witness.  These aren't receipts that would be

22   given just to anybody; they would be kept by the

23   participants in this transaction.  And the conversations

24   bear out the purpose of the receipts; that is, to serve as a

25   guarantee in the event, for example, the CW dies or

1   something, then the guarantor, in this case Aref, can help
2   to collect the money on the CW's family's behalf.  So this
3   January 2 transaction is where the scheme is actually
4   consummated, money is accepted first by Aref and he ensures
5   all of it is there, it's given to Hossain, and then later in
6   the day the cooperating witness, as set forth in the
7   affidavit, meets with Aref and picks up a copy of the check,
8   $2,000 check payable to the cooperator's business and picks
9   up a copy of the receipt.  Aref has taken the receipt,
10  generated a copy and given one copy to the cooperating
11  witness.

12          Following on, after that January 2 meeting,
13  there are a number of additional meetings in which cash is
14  provided to both defendants and they follow the same
15  pattern.  And they're all captured on videotape, save one.
16  And those are transactions, again, in which the cooperating
17  witness provides the cash to Aref, who counts the cash and
18  ensures that it's all there, gives it to Hossain, a receipt
19  is generated and a check is provided to the cooperating
20  witness, representing that it was payable to his business,
21  again, in line with the scheme, goal to demonstrate or at
22  least provide the indication and cover that the cooperating
23  witness had provided legitimate services and work for
24  Hossain.

25          As the case progressed, the defendants

1    learned more about the particular use to which the missile

2    will be put.  As the case progressed, the cooperating

3    witness had conversations with Hossain alone, with Aref

4    alone and with the two of them together, in which he

5    described his affiliation with the group called

6    Jaish-e-Mohammed or JEM and described how this missile was

7    being sent down to New York City to be used in a terrorist

8    attack against a Pakistani government official in

9    retaliation for the policies of the Pakistani President

10   Musharraf.  And this information was provided to each of the

11   defendants separately and then provided to both of them

12   together in a following February 12th conversation that

13   the CW had during a money-passing transaction.

14             The evidence in this case shows that as the

15   defendants learn more about the particular use to which this

16   missile would be put, they didn't sever their relationship

17   with this defendant, they didn't notify law enforcement

18   about the information that they had learned; they continued

19   to engage in these transactions and, in fact, the defendant

20   Hossain asked for additional money after he had learned

21   about this information, and defendant Aref had conversations

22   with the cooperating witness about acting secretly, about

23   keeping quiet, about the particular use to which the missile

24   would be put because that's how people who are doing that

25   sort of thing do it.

1             As the transactions progress farther along,

2    later on in the scheme, in the early summer, around June of

3    2003 -- excuse me -- 2004, Aref actually asked the

4    cooperating witness to go in on a business proposal in which

5    he said to the cooperating witness, can I purchase -- or

6    would you like to go in with me on the purchase of Hossain's

7    pizza place, and Aref proposed that the cooperating witness

8    use some of the proceeds that were still in Hossain's

9    possession and essentially forgive some debt in order to pay

10   the cooperating witness his share.  During the course of

11   that conversation, which is again recorded, the cooperating

12   witness represented to Aref that he might be interested in

13   doing that, that he would have to be a silent partner and,

14   amongst other things, that once this missile was used down

15   in New York City, he would have to leave the country for a

16   couple months because, essentially, I think that the

17   implication was the heat would be on.  And Aref responded in

18   sum and substance that that wouldn't be a problem.

19            As the Court is aware, the takedown took

20   place earlier -- or excuse me -- at some point last week.

21   During the course of the execution of the search warrant,

22   receipts were found at the Masjid As Salam mosque where Aref

23   served as the Imam.  Over $6,000 in cash was found in

24   Mohammed Mosharref Hossain's residence.  Another thousand

25   dollars cash was found on his person.  As the Court is aware

1   today, we had an arraignment on a 19-count indictment that a
2   grand jury issued on Friday endorsing essentially, at least
3   as far as the grand jury could, the strength of the evidence
4   in this case.  And included in the Indictment are some
5   sentencing allegations in the back portion which essentially
6   allege certain sentencing factors in the wake of the Blakely
7   decision, and included in those allegations which the grand
8   jury endorsed is the allegation that this case involves
9   crimes that involved or were intended to promote what's
10  called a federal crime of terrorism.  As your Honor may be
11  aware, that enhancement, if found guilty by a jury, would
12  make this case an offense level 36, a criminal history
13  category of VI, yielding a guideline range of 210 to 262
14  months.
15          We certainly submit that those penalties
16  create a tremendous incentive to flee in this case.  And all
17  of the information I've described, again, is captured on
18  tape.  We submit that because of the nature of the case, the
19  evidence is very strong, and the characteristics of the case
20  and the weight of the evidence all strongly favor detention
21  in this case.
22          THE COURT:  Let's assume for the sake of
23  argument that certainly given the audio and videotapes that
24  the Government will have no difficulty proving what is
25  alleged in the complaint, but a reading of the complaint

1    also suggests certain defenses, including entrapment.  What,

2    if any, evidence does the Government have of the

3    predisposition of either defendant?

4               MR. GRABLE:  Your Honor, the Government has

5    evidence of -- or at least we would introduce evidence and

6    say that it shows predisposition on a number of different

7    fronts.

8               As the Court is well aware, and was included

9    in the search warrant application for the mosque, Aref's

10   house and Hossain's residence, as to defendant Aref in

11   particular, his name in June of 2003, we've been informed by

12   the Department of Defense, was recovered and found in a

13   notebook following a raid on a terrorist camp in -- near

14   Rawa, Iraq.  Included in that notebook were the names of

15   various individuals.  The notebook was found along with

16   other pocket litter, rocket propelled grenades, from my

17   understanding, shoulder fired missiles, and small arms and

18   weapons manuals.  And in that notebook was included an entry

19   for the name Yassin Aref; it had a Leonard Place, Albany,

20   New York street address, with a specific number which was

21   Aref's address for his early portion of his time here in the

22   United States.  It had a telephone number which was Aref's

23   telephone number for his early portion of his time in the

24   United States.  And it had underneath it a title, Commander

25   Yassin, New York, United States.

UNITED STATES v AREF and HOSSAIN          30

1           THE COURT:  In what language was the word
2    "commander" written?
3           MR. GRABLE:  It's my understanding that it
4    was an Arabic language document.
5           THE COURT:  Is it subject to any other
6    interpretation other than commander?
7           MR. GRABLE:  I don't know the answer to that,
8    your Honor.  We're relying on a translation provided to us
9    by the Department of the Defense.
10          When Aref was arrested and interviewed by law
11   enforcement following his arrest, he did not -- well, first
12   of all, he told law enforcement that he was never in the
13   military and he had no explanation for it, and he offered no
14   explanation as to why his name was found in this book
15   following this attack on the terrorist camp.  We certainly
16   submit that that information, given the nature of the scheme
17   in this case, will be very strong evidence of predisposition
18   as to defendant Aref.
19          There is additional evidence that we would
20   offer to a jury and argue to a jury to show predisposition
21   as to both defendant Aref and defendant Hossain, including,
22   amongst other things, the readiness in which they accept the
23   proposition to launder, which the Second Circuit has said,
24   accepting a criminal proposition without any hesitation is
25   alone sufficient to show predisposition to support a jury

1   verdict.   We submit that certainly the evidence in this case

2   will show that these defendants didn't show hesitation when

3   they knew what was going to happen in this case.   And as

4   they learn more about the particular use to which the

5   missile would be put, they in fact continued on and

6   laundered more and more money.   In addition to that, we

7   would argue about the repetitive nature of the conduct, the

8   number of the transactions, the advice that Aref offered to

9   the cooperating witness about moving secretly and hiddenly

10   and other factors as described in the complaint that we

11   think would show that a reasonable person in this case would

12   not have acted as these defendants did and accepted this

13   proposition but, instead, certainly would have run the other

14   way.   We submit that all of that is sufficient to rebut an

15   entrapment defense in this case.

16              All of that information bears strongly on the

17   third factor as well that this Court must consider in this

18   case, which is the history and characteristics of the person

19   involved.   As the Court is well aware, there's a number of

20   different subsets of information that it may consider under

21   that factor.   And going first with defendant Aref, he's not

22   a lawful permanent resident or citizen of the United States.

23   He has refugee status in the United States.   He has

24   significant ties to foreign countries.   He was born and

25   raised in Iraq as reflected in the pretrial services report

1   and spent 26 of his 34 years there.  He has a number of
2   family members in Iraq as shown in the PSR, a third brother
3   in Holland.  He spent four years in Syria.  During the
4   execution of the search warrant, searching agents found a
5   Syrian ID card in his name which was valid through the Year
6   2007.  There are financial resources that we submit
7   defendant Aref has access to, at least past conduct suggests
8   he would have access to, that would assist him in fleeing
9   should he have the opportunity to.  There are wire transfers
10  that are outlined in the search warrant affidavits that
11  defendant Aref appears to have engaged in.  During the
12  month -- or excuse me -- during the Year 2001, as set forth
13  in the search warrant application, the defendant Aref,
14  according to an individual down in Georgia, wired between --
15  or excuse me -- transferred, not wired, but transferred
16  between $15,000 and $18,000 to Iraq.  He also -- and this
17  occurred as set forth in the affidavit during a time when he
18  was telling Albany County Department of Social Services that
19  he was making $200 a month and that was his sole source of
20  income.  He also wired, as set forth in the search warrant
21  affidavit, another, I think, $1,300 to an individual in
22  Greece.  This person, as set forth in the search warrant
23  affidavit, was arrested six months after the wire transfer
24  by Greek police in connection with what sounds like a
25  fraudulent document possession and manufacturing operation.

1    And I don't have further information on that individual, but
2    we submit that all of that information indicates that he has
3    these ties to foreign countries as well as an ability to
4    marshal resources, it would appear, to flee if given the
5    opportunity.  The camp information that I described already
6    in response to the entrapment question, we submit, shows
7    that this defendant presents a danger to the community if
8    released.  That sort of personal history and characteristic
9    would suggest that his release could pose a danger to the
10   community.

11                  One of the factors the Court can consider
12   under this element is the character of the defendant, and we
13   submit that the investigation and take-down has yielded
14   evidence suggesting that the Court should have concern about
15   defendant Aref's character in this case.  He was asked
16   multiple questions during the course of a post-arrest
17   interview.  One of the questions he was asked was whether he
18   had ever heard of or knew about a group called
19   Jaish-E-Mohammed, JEM.  As the Court will recall, that is
20   the group that the cooperating witness told Aref on tape
21   recorded English language conversations and communications,
22   the CW told Aref that that was the group that he was working
23   with and that was the group that was essentially behind this
24   missile importation.  Aref told Special Agent Timothy Coll
25   during the post-arrest interview the other night that he had

1   never heard of that group, contrary to what he had told the

2   cooperating witness on the tape recording, which is that he

3   had heard of the group, that he knew they were on the

4   Government's list of terrorists group.  JEM is, in fact, on

5   the State Department's list of foreign terrorist

6   organizations.  We submit that's not the type of lie that's

7   simply a claim by the Government that he defrauded somebody.

8   It's -- he's on the tape saying it, and he denied it to

9   Special Agent Coll the other night.  We submit that bears on

10  his character.  In a similar vein, he was asked about money

11  transfers to foreign countries and told interviewing agents

12  the other night that he sent a total of $600 to $700 to

13  Iraq, when, in fact, at least we submit, as set forth in the

14  complaint, it appears he sent in one year alone between

15  $15,000 and $18,000 with the help of an individual in

16  Georgia and other money to Greece and perhaps other money to

17  other places.  He was asked by agents during the course of

18  his post-arrest interview whether he had ever heard of the

19  name Lahlo Garan (phonetic) or had ever used or went by that

20  name.  And Special Agent Rudd during the course of that line

21  of questioning, I believe, wrote down the name for the

22  translator who was there for -- the translator who was there

23  to ensure that there was no miscommunication, and Aref

24  answered no, he had never heard of that name and had never

25  used that name.  In August of 2003, Aref was observed going

1    into a post office in the Capital District, and we've

2    reviewed still photos of that date, and these still photos,

3    approximately five of them, capture Aref walking up to a

4    certain -- one desk or teller in the post office, obtaining

5    a money order for a thousand dollars, walking back, doing

6    what looks like completing an express mail envelope package,

7    walking up to a different person and mailing that package or

8    conducting another transaction.  We -- the Government has

9    acquired the money order that was completed by or appears to

10   have been completed by Aref in that case, along with the

11   express mail envelope.  It appears to have been completed by

12   him in that case.  It was a thousand dollar money order, and

13   the person who was allegedly sending it was named Lahlo

14   Garan, the same name that the defendant Aref told Special

15   Agent Rudd he never heard of, he had never used before.  The

16   address on the money order and the address on the return --

17   excuse me -- on the envelope that mailed the money order was

18   the address of the Masjid as-Salam mosque, 278, I believe,

19   Central Avenue.  We submit that, again, this piece of

20   information provides the Court with evidence showing that

21   there's reason to have concern about the veracity of the

22   defendant Aref and his willingness and ability to abide by

23   any conditions of release.

24                   And just to close that up, FBI agents did a

25   search of a number of different data bases for the name

1    Lahlo Garan and couldn't find it anywhere.  This was back in

2    August 2003; choice Point, DMV, State Department,

3    LexisNexis; nowhere, but it appears to be on that money

4    order in Mr. Aref's handwriting, and Mr. Aref told the

5    agents he never heard of it before.

6              Finally, bearing on the character of

7    defendant Aref, the fraud scheme is alleged in this case.

8    The facts associated with a fraud scheme, the Government

9    submits Aref engaged in, are alleged in the search warrant

10   affidavit for the mosque and Aref's residence.  The facts

11   contained in the affidavits describe how Aref, it appears,

12   hid his income from Albany County Department of Social

13   Services, both employment income and rental income, in order

14   to be able to obtain benefits to which it appears he wasn't

15   entitled.  So we submit that also bears on his character.

16              All of those factors and all of those

17   circumstances take into concert, we submit, show that this

18   defendant's history, character and other factors strongly

19   favor detention in this case.

20              Moving on to defendant Hossain's personal

21   characteristics, we submit that those also --

22              THE COURT:  Well, before we do, as to

23   Mr. Aref, is there any evidence or intelligence upon which

24   the Government relies which links, other than the notebook

25   found in northern Iraq, which links Mr. Aref to any

1    terrorism or foreign organizations?

2              MR. GRABLE:  If I could have a moment, your

3    Honor.

4              THE COURT:  Yes.

5              (Pause.)

6              MR. GRABLE:  At this point, your Honor, we're

7    not offering anything else on that score.

8              THE COURT:  As to Mr. Hossain.

9              MR. GRABLE:  As to Mr. Hossain, the personal

10   characteristics and history of defendant Hossain also favor

11   detention in this case, we submit.  Although he has many

12   ties to the United States, he has significant ties to

13   Bangladesh, his country of origin, and there are various

14   indicators that he was planning -- just before the take-down

15   in this case, he was making plans and doing things to

16   prepare for a trip to Bangladesh with his entire family.  On

17   the day of his arrest, he was heading back up from New York

18   City and he had in his possession updated passports for

19   himself, his wife and three of his children, all of which

20   contained visa -- or excuse me -- stamps in the passport

21   section which appeared to be essentially a visa substitution

22   saying that he would not need a visa, neither would any of

23   the holders of the passports.  Passport holders need visas

24   in order to gain access to Bangladesh.  Hossain told the

25   cooperating witness before the case was taken down that

1  Hossain's mother-in-law and two of his other children

2  intended to travel to Bangladesh on August 17th, and

3  during the execution of the search warrant one-way airline

4  tickets for a trip to Bangladesh were found.  Hossain told

5  the cooperating witness that he was going to go back to

6  Bangladesh as soon as he could or as soon as he sold his

7  pizza parlor, and if he couldn't sell it, he would simply

8  close the pizza parlor and leave.  In addition to that, I

9  think the search warrant and again the complaint

10 affidavits --

11            THE COURT:  Is it your interpretation that he

12 intended to leave the United States for good?

13            MR. GRABLE:  I don't have a clear picture of

14 that, your Honor.  I do know he has some real estate

15 properties here, but we do submit that closing up his pizza

16 business at least would -- you know, could support an

17 inference that he was intending to leave for a while.  And

18 we certainly submit whether he was intending to leave for a

19 while or not, this information shows he has an inclination

20 and is ready, willing and able to leave the country; and now

21 that he's charged with a crime carrying these types of

22 penalties, he would take advantage of that if he could.

23            In addition, your Honor, we've spoken with --

24 or we've determined that it appears that the United States

25 has no extradition treaty with Bangladesh, so that in the

1    event that the defendant were released and did flee, there

2    would be -- it appears there would be little chance of ever

3    having him face these charges in a court in this country.

4             There's some other past conduct of defendant

5    Hossain which is set forth in the complaint, the document

6    fraud that was the sort of beginning of the relationship

7    between the cooperating witness and defendant Hossain in

8    this case.  Hossain admits to tax evasion during the course

9    of this scheme, during the early portions of it in December,

10   January 2003, 2004.  In recorded conversations Hossain talks

11   about not recording approximately $500 to $800 worth of cash

12   proceeds from his pizza business and not reporting them so

13   that he didn't have to pay taxes on them -- excuse me --

14   taxes on those funds.  We submit that that at least to some

15   degree bears on the nature and characteristics of the person

16   involved.

17            And, again, as is the case with Aref, we

18   submit that the post-arrest interview of defendant Hossain

19   yielded some information that this Court should consider

20   when addressing this detention question.  During recorded

21   conversations during the course of this scheme, the

22   defendant Hossain told the cooperating witness that he was a

23   member of a group called Jamaat-e-Islami, and I think it's

24   identified in the complaint affidavit and search warrant

25   affidavit by the letters JEI.  He even went so far as to

1    tell the cooperating witness that he was a person of

2    authority or at least somewhat of a higher-up in the group,

3    and I've heard that term referred to as a Nasam or Naseem,

4    but in any event, Hossain represented to the cooperating

5    witness on tape membership in this group and a particular

6    position in this group.  When interviewed by Special Agent

7    Coll the night of the arrest and asked about JEI, Hossain

8    denied that he was a member of JEI, and we submit that, once

9    again, this isn't a case of interpretation of actions or

10   deeds; you've got a recorded conversation in which he

11   represents one thing and a simple flat out question in an

12   interview where he represents exactly the opposite.

13                  THE COURT:  Maybe you said this earlier.

14   What's the significance of JEI?

15                  MR. GRABLE:  JEI is -- it's a group that

16   public -- well, in the course of the case here, JEI comes

17   up, it's my recollection, when the cooperating witness is

18   having a conversation with Hossain somewhere, I guess you

19   would say, in the middle of the scheme or so, February or

20   so, or maybe even March, but I think it's probably February,

21   and the cooperating witness makes a comment about the

22   martyr's blood being spilled, and Hossain says in response,

23   amongst other things, I told you before -- I believe he said

24   I told you before, I told you I'm a member of the

25   Jamaat-e-Islami and my wife is a member as well; and then

1    later in a conversation he says he's the Naseem.  It's

2    alleged in the complaint affidavit that JEI, by public

3    source information, is an Islamic fundamentalist political

4    party in Pakistani with chapters in Bangladesh.  That's

5    what's alleged in the complaint affidavit.  The Government

6    has seen a various range of, I think, public source

7    information; some public source information may link this

8    group with extremists, some public source information may

9    say they're a political party.  The Government submits

10   though that perhaps most importantly for your Honor's

11   decision is the fact that the defendant obviously saw it not

12   to his advantage to admit what he had told the cooperating

13   witness before and lied about that during the interview.

14              Real brief issue, your Honor, on Hossain's

15   character, he told Probation in the presentence interview

16   that he owned four properties; West Street, Alexander

17   Street, Elk Street, and Clinton Avenue.  The pretrial

18   services report on page 2 indicates that a Westlaw check

19   confirms that he owns the Alexander Street and West Street

20   properties, but has nothing for Elk Street, it looks like,

21   or for Clinton Street.  And checks that the Government

22   performed with Albany County indicate that he's not the

23   owner of the Elk Street or the Clinton Avenue properties.

24              THE COURT:  I was advised today by pretrial,

25   it may not be unusual for a delay to occur in transfer of

UNITED STATES v AREF and HOSSAIN                    42

1   title at an auction hearing.

2                    MR. GRABLE:  Okay.  We were wondering that as

3   well, your Honor, but that's another piece of information

4   that we had.

5                    The last factor the Court has to consider is

6   the nature and seriousness of the danger posed by the

7   defendants, and we certainly submit that this factor in

8   particular with defendant Aref strongly favors detention.

9   Here, you have an individual whose name was recovered from

10  an address book following a raid in a terrorist training

11  camp -- or excuse me -- a terrorist camp in northern Iraq in

12  June of 2003, who appears to have been willing to serve as a

13  witness and guarantor and participant in a money laundering

14  sting transaction in which he understood that a missile was

15  being sent down to New York City to commit a terrorist

16  attack.  We submit that that type of individual poses a risk

17  to the community in part and in particular because he has

18  now been identified in terms of what the investigation has

19  revealed about him.

20                   We submit that the nature of the crime in

21  this case also demonstrates that Hossain, particularly

22  because of his willingness to commit this offense, is a

23  danger to the community.

24                   And for all of those reasons, we ask that the

25  Court detain both of these defendants pending trial.

1          THE COURT:  As to Mr. Hossain, I'll ask you

2   the same as to Mr. Aref, other than the circumstances of

3   this case and what you previously referred to about the

4   membership in a political or other kind of party, is there

5   any evidence or intelligence upon which the Government

6   wishes to rely to establish any ties of Mr. Hossain to any

7   terrorist or foreign organizations?

8          MR. GRABLE:  No, there are not.

9          THE COURT:  Thank you.

10         MR. GRABLE:  We would point out defendant

11  Hossain is the one who recommended Aref as a guarantor in

12  this transaction and Aref has that connection to the camp.

13         THE COURT:  Thank you.

14         MR. GRABLE:  Thanks.

15         THE COURT:  Mr. Kindlon.

16         MR. KINDLON:  Thank you very much, your

17  Honor.  May it please the Court.  Mr. Grable.  And Mr. Aref.

18  And Mr. Luibrand.

19         Judge, in listening to what was concededly a

20  brilliant presentation by the Assistant U.S. Attorney, I

21  must admit that I had the feeling I had gone through the

22  looking glass or fallen down the rabbit hole, because what

23  he's describing is, we must remember at all times, play

24  acting that was performed by a governmental informant that

25  was done very convincingly and clearly in an effort to

1    entrap two individuals into the appearance of criminal

2    conduct.

3                Now, 3142 does set forth the factors that

4    need to be taken into account when the Court is considering

5    the question of whether or not a person accused should be

6    released pending trial either on bond or on conditions.  And

7    I would submit, your Honor, that an examination of those

8    factors in this case strongly urges the conclusion that my

9    client Yassin Aref poses no risk of flight and is no danger

10   to the community.

11               Now, let me just talk briefly about the

12   nature and the circumstances of the offense.  A person in a

13   much higher pay grade than mine, James Comey, who's second

14   in command at the Justice Department, has unequivocally

15   stated that this is not the case of the century, and when

16   you take a magnifying glass and hold it over this Indictment

17   and think about the words and the content that it contains,

18   that's the only conclusion you can draw.  And rather than go

19   through the search warrant application paragraph by

20   paragraph or the Indictment paragraph by paragraph, let me

21   just summarize this as far as my client Mr. Aref is

22   concerned.

23               This man, Judge, this 34 year old father of

24   three, sitting here -- that's okay, sit down -- he's accused

25   of money laundering, and as part of that money laundering,

1   one of the things that's held forth as evidence of this
2   complicity of money laundering is the fact that he gave
3   receipts in triplicate.  What kind of a money launderer
4   gives receipts? Any superficial knowledge of how Muslim men
5   conduct financial transactions with each other tells us
6   that, first, when money is borrowed or lent, interest is not
7   to be charged.  And secondly, these, these folks, unlike the
8   Government, they don't -- they can't do Westlaw searches and
9   Lexis searches.  They're still in the pencil and paper era.
10  What they do is bring a witness in and request a witness to
11  come in and say please watch this transaction and make a
12  record of it, so that if I die, my son will get the money
13  that I'm owed.  Because they can't go to Surrogate's Court,
14  they don't have one in their culture, and they haven't
15  really fully acclimated to ours yet.

16               Also, in this money laundering scheme that my
17  client has been accused of participating in, it's very
18  significant, the Government never says he made a dime.
19  Doesn't make a nickel.  Doesn't make a penny.  And in sum
20  and in substance, your Honor, clearly what we're dealing
21  with here is a situation in which my client, Imam Aref, a
22  holy man, fulfills a role of nothing more than what we call
23  a notary public.  He comes in, he's somebody you can trust,
24  he's somebody who's got the ability to look and to perceive
25  and to confirm these facts and to write them down, which is

1    something else that's done in their tradition, and to give

2    everybody, everybody a receipt so that it's unequivocally

3    established that the money which was borrowed and lent was

4    involved in that -- in those transactions.

5              As to the weapons offense, Mr. Grable has

6    given these photographs, and my clients says to me, never I

7    saw this tube, this weapon, which is set forth in Government

8    Exhibit 2.  And there's no claim that he did.  There's no

9    claim that he did.  And also he says, and again I quote him,

10   never I saw this thing, which I perceive to be a triggering

11   mechanism for a RPG or a SAM missile; it looks like the back

12   end of a 45 caliber pistol handle and the front end is a

13   pelican beak; I don't know how better to describe it; that's

14   Government Exhibit 4.  "Never I saw that" confirms my --

15   okay, okay, calm down -- Judge, it's really critically

16   important to remember, your Honor, when dealing with

17   circumstances of the offense charged here that the offense

18   charged here arises out of a and rests exclusively on a

19   foundation of lies and deceit engineered by the Government

20   and recorded through what we're told as much as a two-year

21   intensive FBI investigation.  And if this is the best they

22   can do, then we know that Mr. Comey was quite correct when

23   he said this is not the case of the century.  In fact, they

24   may not even be the case of the weekend.  There's just not

25   anything to it of any real substance.

1           Now, I think that also covers the weight of
2   the evidence.
3           THE COURT:  Well, before you get off the
4   weight of the evidence, Mr. Kindlon, do you care to comment
5   on the statement, this was not a sting operation involving a
6   trip to Disneyland or a pound of cocaine, it was a surface
7   to air missile to be used to assassinate somebody in New
8   York City?
9           MR. KINDLON:  My client never heard anything
10  of that sort, your Honor.  And the Court, by that question,
11  raises a very good point, because if, if the confidential
12  informant came into my client's life and said that he was
13  engaged in a drug transaction, would my client be charged
14  with a drug offense?  If he was to say he was engaged in a
15  bank robbery, would my client be charged with a bank
16  robbery?  This is a fictitious, utterly fictitious story
17  which was made up in an effort to entrap my client into some
18  sort of criminal conduct.
19          And, your Honor, I submit that at this
20  juncture, while entrapment is an attractive word to use in
21  defense, I submit that my client never even engaged in any
22  activity that could be called in any objective fashion
23  criminal.  So, accordingly, if you don't engage in any
24  criminal activity, you don't need the defense of entrapment
25  to show your lack of guilt.

UNITED STATES v AREF and HOSSAIN                48

1          The weight of the evidence in this case is

2    such that when it's fully run out in front of a jury, I

3    respectfully submit the charge will be rejected out of hand.

4          As to my client's personal characteristics, I

5    think -- I submit that they're terribly significant, your

6    Honor.  Yassin Aref has no prior criminal history.  None.

7    He is married.  His wife has some health problems.  I think

8    it would be fair to say his wife has some fairly significant

9    health problems, which, of course, is very significant in

10   light of the fact that they are the parents of three young

11   children between the ages of 5 and 9, three young children

12   who, like all other young children in America, are probably

13   worried about having to go back, be back to school in three

14   weeks, probably worried about the fact that summer vacation

15   is almost over, and probably need to get ready for the

16   coming school year.  And, obviously, they are gonna have a

17   much harder time if their father is locked up on these

18   charges.

19         My client's home is in this country.  He is

20   here -- Mr. Grable said not lawfully, and I respectfully

21   disagree with that.  My client is here as a refugee from

22   Iraq.  And he fled Iraq, where he lived in that part of Iraq

23   called Kurdistan back in about 1995, and he fled to Syria

24   where he married and he and his wife brought into this world

25   the three children of whom they are the parents.  He's an

1    educated man, your Honor.  He has studied history, he

2    studied comparative religion in college.  I had the

3    opportunity -- I say this as an officer of the Court -- to

4    have extended conservations with my client.  I find him to

5    be -- and I think the Court should be aware of this -- a

6    sensitive, intelligent, thoughtful, philosophical and deeply

7    devout individual.

8              Again, in this connection I have to get back

9    to the fact that these charges are based on a concocted

10   story.  And my client's participation in the events that

11   arose as a consequence of that concoction are really limited

12   to being nothing more than a notary public type participant.

13             What I think should be called the extraneous

14   stuff, the other information that Mr. Grable has shared with

15   the Court, this business about my client's name and address

16   being written in an address book which was apparently seized

17   in December of 2000 -- excuse me -- which was apparently

18   seized last year from what is described as a terrorist camp,

19   now, the Government says it's a terrorist camp, I guess we

20   have to take their word for it right now; there's really

21   been no proof other than that conclusory statement.  We have

22   not had the benefit of seeing any such notebook or piece of

23   paper or anything.  For all we know, it's a notebook

24   containing the names of 100 Imam.  For all we know, it's an

25   address book that was stolen from one of my client's many

1    relatives still living in Iraq.  For all we know, it could

2    mean almost anything.  Nobody I've heard here today is

3    suggesting that my client was a terrorist in Iraq.  I mean

4    if that's what we're supposed to infer from this, let's say

5    it, let's prove it.  But to say the name of an individual

6    appears on a piece of paper found by a soldier in a blown up

7    pile of sand somewhere in the Middle East, that it proves

8    anything; it doesn't, Judge; it doesn't prove a thing.  I'm

9    told also that the camp was a place where a group called

10   Ansar al-Islam was located and the Human Rights Watch tells

11   us that that group never came into existence in Pakistan --

12   or in Kurdistan until December of 2001, which was six years

13   after my client left Iraq and a couple years after he left

14   Syria for the United States as a refugee brought here by the

15   United Nations High Commission for Refugees.

16              THE COURT:  That fact may cut both ways, Mr.

17   Kindlon.  The notebook had his Albany address, not his north

18   Iraqi address.

19              MR. KINDLON:  Well, again, your Honor, we

20   don't know what that means.  We don't know what that means.

21   It could be -- and I know that Mr. -- excuse me.

22              (Pause.)

23              MR. KINDLON:  Mr. Aref asked me to point out

24   that the address they say was in that book was his address

25   of five years ago.  And, again, your Honor, I do know from

UNITED STATES v AREF and HOSSAIN          51

1    conversations with my client that he has many relatives who

2    are still in Iraq, living there, including brothers and

3    nephews and other, other family members.

4                THE COURT:  Which brings out the significance

5    of the word "commander" written next to it.

6                MR. KINDLON:  Yes.

7                THE COURT:  Any comments on that?

8                MR. KINDLON:  Okay.  And you know, your

9    Honor, who says that the word "commander" is the proper

10   translation.  It could be leader.  It could be Imam.  It

11   could be father.  It could be almost anything.  And, you

12   know, the wisdom of our being able to confront the witnesses

13   against us is pretty clear right now, because all I can do

14   is speculate, and all any of us can do is speculate, and I

15   would respectfully submit if all we can do is speculate in a

16   court of law, then we ought not to consider the information

17   to have any significance whatsoever.

18                The fact that money was sent by my client to

19   his brother -- actually to his brothers, three, three

20   brothers in Iraq, there's a -- there is, believe me, a

21   significant dispute over the amount, but there was some

22   money sent to Iraq to his brothers overseas, they were in

23   desperate straits there.  There was also some mention of a

24   wire transfer to some character in Greece.  The fact of the

25   matter is the -- and understand, your Honor, I mean, we all

1    understand, we're dealing here with a very dangerous set of

2    circumstances across the waters.  Imam Aref was told one day

3    that a nephew of his had been kidnapped and would be

4    executed unless he sent money.  And that's what he did.

5    Basically he paid a ransom to some unseen, unknown to him

6    kidnapper in response to a kidnapping threat to save a life.

7                     Now, it has also been said in considerable

8    detail and at some length that certain facts demonstrate

9    that my client, Imam Aref, is a danger to the community.  I

10   respectfully submit, your Honor, that any objective view of

11   the circumstances of this man's life lead to the exact

12   opposite conclusion.  Imam Aref is a leader of a small

13   religious group in a mosque in Albany.  Now, again, as an

14   officer of the Court, I say to you I've been to that mosque,

15   I went there last Friday afternoon, in time to arrive there

16   at the conclusion of Friday afternoon prayer, and met there

17   with about a hundred people, a hundred thoughtful, calm,

18   solemn and devout people; and they all came to me and told

19   me how important the Imam was to them and to their mosque;

20   they told me what a good person he was; they told me what a

21   good father he was; they told me what a good leader he was;

22   they told me what a holy man he is.  And that's the reality,

23   Judge.  And no Lexis search, no call to the county clerk's

24   office is gonna come up with any better information than

25   that.  This is a good and moral man, a religious leader.

1          And last but not least, the question has to
2   be asked, is he a risk of flight?
3          Again, he's the exact opposite of a risk of
4   flight.  You know, the Statute of Liberty, the engraving on
5   it talks about the huddled masses.  And I met my client and
6   his family, and I thought, my God, this is what we're
7   talking about; these people are huddled masses; they came
8   here to get away from a terrible, terrible world; they came
9   here as refugees, came here for a better life.  They're
10  huddled down, hunkered down.  Aref and his wife and their
11  three children are really for the first time feeling, until
12  last week, perfectly safe in their lives.  Risk of flight?
13  Far from it.  He's got no place to go, Judge.  He's here as
14  a refugee.  He can't go to any other country.  He doesn't
15  have a passport.  He hasn't got a bus fare to Colonie right
16  now.  There's nothing he can do except stay here.
17         This Court can fashion conditions which will
18  protect the community, to the extent that it needs to be
19  protected, which I respectfully submit is to no extent at
20  all, but this Court can fashion conditions to satisfy itself
21  that any protection the community needs, it will have, and
22  also to ensure my client's appearance at future proceedings
23  in this case.
24         There can hardly be a doubt, Judge, but that
25  this case is going to go to trial.  There can't be a doubt

1    that that's where this matter is headed.  And we know from

2    our experience in the system of justice over the years that

3    if we move at the speed of light, if we go at flank speed,

4    we're still talking six to eight months from now before jury

5    selection can be commenced.  And my client's family needs

6    him back.  My client's -- only word I know is as a

7    westerner -- my client's congregation needs him back; his

8    people need him back; his people want him here.  And under

9    all the circumstances, your Honor -- and I recognize that

10   pretrial services has recommended otherwise, and I recognize

11   that there are some very dramatic claims here, but

12   nonetheless, the reality is that the factual basis for these

13   charges is simply insufficient to support the conclusions

14   that you're being asked to draw about my client's risk of

15   flight and danger to the community.  I respectfully ask you,

16   Judge, please, exercise your discretion and release my

17   client, if need be, on conditions; home confinement,

18   electronic monitoring; GPS, whatever it takes, so that he

19   can take care of his wife and take care of his children and

20   serve his congregants and live his life until such time as

21   we can go to trial and I submit secure a not guilty

22   determination of this charge.

23            THE COURT:  Mr. Kindlon, do you dispute the

24   Government's assertion that Counts 11 through 19 raise a

25   presumption?

1      MR. KINDLON: I don't, your Honor. I think
2   that all the facts and circumstances rebut that
3   predisposition to leave this Court to release my client.
4      THE COURT: As to their sentencing guidelines
5   calculation?
6      MR. KINDLON: Well, Judge, the last time I
7   checked, there are no sentencing guidelines. I think
8   Blakely obliterated them. It gives me the greatest pleasure
9   to agree with Justice Scalia about something after all these
10  years. The fact is, that it's -- really, it takes a real
11  leap of faith to get us to a level 36 under these
12  circumstances, and I think basically what we're dealing with
13  here is just a regular old money laundering case, Judge, at
14  best.
15      THE COURT: Well, one thing we're not going
16  to decide today is the meaning of Blakely.
17      Mr. Luibrand.
18      MR. LUIBRAND: Thank you, your Honor. After
19  about 20 years in these courtrooms, I can read the tea
20  leaves and I can tell how proceedings of this nature are
21  going. Let me point out one critical point and that is that
22  the proof that there was not an entrapment, the proof of
23  Mr. Hossain's predisposition to committing these crimes is
24  at that table (indicating), it's at that table in
25  determining and calculating the weight of the evidence and

1    in determining the strength of their case.  1985 he came to

2    the United States.  He worked as a dishwasher, worked his

3    way up to a cook to chief cook, to owning a pizzeria with a

4    partner, to owning a pizzeria on his own.  He's been here

5    over 20 years and he's been a United States citizen for ten

6    years.  He has five children.  He has a wife.  He is the guy

7    that takes the orders on the pizzas, he's the guy that puts

8    them in the boxes, he's the guy that runs out to State

9    Street and Lark Street delivering the pizzas.  That's what

10   he does.  If he ain't there, they ain't getting delivered,

11   and there's no business and there's no income in this

12   household.

13              The predisposition that's been articulated by

14   the Government with respect to Mr. Hossain is zero,

15   absolutely zero.  No prior criminal record.  No prior

16   engagement, involvement, in any terrorist organizations or

17   anything even associated with terrorism.  The organization

18   identified by Mr. Grable, Jamaat-e-Islam, is a political

19   party in Pakistan of which substantial members of the

20   population are members.  It's not a terrorist organization.

21   And they use words like they're linked to extremists.  These

22   words that mean nothing.  That's how you ruin somebody, by

23   using language like that.  That's how you destroy a person's

24   ability to make a living, by using these words.  Their case,

25   if they can't establish a predisposition by this man to

1    commit these crimes, is dead.  It goes no place.  He will
2    walk out of the courtroom with that.  And there's no reason
3    he should spend the next eight months in jail waiting for
4    them to come up with a predisposition that they're not
5    capable of doing today.  They're not able to articulate one.
6    If you go to their affidavit, they have nothing as a
7    predisposition, up until the point they met, and they got
8    this confidential informant out there, pedaling, pedaling,
9    selling licenses and permits.  He's selling them.  He didn't
10   go to them.  Mr. Hossain didn't go to this guy.  This guy is
11   out on Central Avenue hitting up Muslims, trying to sell
12   them licenses.  That's what he does.  And that's how he
13   walks into my client's business.  According to the
14   complaint, that's how he walks into the business.  Selling
15   licenses.  No predisposition.  No prior criminal
16   involvement.  No involvement in terrorism.  Barely knows the
17   guy.  And he's pedaling a permit for his retarded brother --
18   I know that's not a politically correct term -- for his
19   retarded brother so that he has an ID.  He can't drive.  He
20   doesn't want to drive, but he needs an ID.  Can't even get
21   into the building without an ID.  The kid wanted an ID.
22   From that, they begin this process of trying to invite these
23   people to commit crimes.  The Government does.  The
24   Government organized, ran, financed and employed the people
25   to run a criminal conspiracy.  And they wanted to find

1    somebody.  And, you know, they didn't go to St. Mary's

2    Church and they didn't go to the Jewish synagogue.  They

3    went to the Muslims.  That's where they went.  And that's

4    wrong.  This case rises and falls on entrapment.  And I'm

5    not telling -- everybody in this courtroom knows entrapment

6    is the central issue in this case, and it's their burden,

7    and they can't articulate today, today they can't articulate

8    his predisposition.  He should be able to walk out of here

9    and help me with his defense because I don't have a

10   battalion of people, lawyers, government, Washington, D.C.

11   He knows it's me and him, and that's it, and I need his

12   help.  And he needs to get out of here with conditions,

13   whatever conditions the Court can impose or find reasonable.

14   He surrendered his passport.  The tickets that they claim

15   that he went and bought weren't even his tickets.  They

16   weren't his wife's tickets.  They were for his mother-in-law

17   and his kids to go to Bangladesh to visit their relatives.

18   And somehow that's a crime.  Somehow the Government is able

19   to portray that as a crime.

20            THE COURT:  As to predisposition, Mr.

21   Luibrand, the Government articulates reliance upon the

22   interactions in the course of the offense alleged here, the

23   ready acceptance and other matters.

24            MR. LUIBRAND:  I would -- yes, your Honor.  I

25   would invite your Honor to page 10 and thereafter of their

1   affidavit.  It took this seller, their person, apparently

2   five meetings t4o try to get a deal together to do this

3   so-called money laundering.  It wasn't like he walked in and

4   said let's launder money.  According to the complaint,

5   Mr. Hossain asked this guy for a loan.  That's according to

6   the complaint.  And there was no exchange, well, how about

7   this, we launder money.  That didn't occur for almost three

8   more meetings.  They started this thing; you need money,

9   I'll get you money, I'll show you how to get money.  That's

10  what the complaint alleges.  I'm relying on what they

11  present, not what our defense is, but what they present is

12  what I'm relying on in the complaint.  We haven't

13  cross-examined anybody.  You know, we're taking everything

14  they say at face value.  Taking these grainy pictures at

15  face value.  Everything taken at face value.  And I'm asking

16  for the Court to take at face value that this guy is an

17  American citizen who works like a dog, who has a family that

18  occupies every waking minute, that and his business, and he

19  could give a darn about terrorism, he could give a darn

20  about what happens overseas.  He's a regular guy.  But he's

21  got a Muslim last name, and that's the only reason we're

22  here.  That's what started this whole process.  And that's

23  not right.  They can't prove a predisposition.  And for that

24  reason, they can't meet that burden today, they're not going

25  to meet it in six months, and he shouldn't have to wait in

1    the can for the next six months for that day to arrive.

2                    THE COURT:  Mr. Grable, anything further?

3                    MR. GRABLE:  Yes, your Honor, thanks, just

4    very briefly.

5                    Going in reverse order, just on the

6    chronology of the events, as laid out in the complaint

7    affidavit, and we submit the evidence will bear out, the

8    defendant Hossain requested a loan from the cooperating

9    witness before the missile was displayed, and then, after

10   the missile was displayed, he reiterated his request for a

11   loan.  Didn't have any concern about the fact that this guy

12   had just shown him a missile that was going down to the

13   mujahid brothers in New York City to be used and it's used

14   to shoot down airplanes.  We submit that there's more than

15   sufficient evidence upon which we're going to be able to

16   rest on that score.  Very briefly --

17                    THE COURT:  Speaking of that photograph, does

18   the Government's evidence include any evidence that the

19   missile itself was ever shown to Mr. Aref?

20                    MR. GRABLE:  I was going to move to him right

21   now.  No, there won't be any evidence that the missile was

22   shown to Aref, although we submit that the evidence will

23   show the trigger mechanism to the missile was shown to Aref

24   which has been offered for purposes of this hearing as

25   Government's Exhibit 2, which shows Hossain in the white hat

1  in sort of a middle of the picture, Aref to the right of

2  him, and the cooperating witness on the other side of the

3  table.  This was January 2nd; this was the day they

4  consummated this first transaction.  And if I could have an

5  exhibit sticker, I would just like to mark this for purposes

6  of identification.

7          THE COURT:  Have Mr. Kindlon and Mr. Luibrand

8  seen this?

9          MR. GRABLE:  No, but I'll show it to them

10  right now, and I'll call it 2-A if that's okay with the

11  Court.

12          (Pause.)

13          MR. GRABLE:  Judge, if you take a look at

14  Government's Exhibit 2, and I'll hand this up for the

15  Court's examination, Government's Exhibit 2, it's a grainy

16  picture, but the cooperating witness is holding something,

17  and the proof is going to show he's holding what you have in

18  your hand right now, the trigger mechanism, and it's

19  described as part of -- during the conversation as the part

20  of the missile by the cooperating witness as going down to

21  New York City and we'll bring up another $45,000.  Aref

22  wasn't shown the missile, but we submit he was shown and

23  told quite enough to impart knowledge to him as to what was

24  going to happen.

25          Very briefly on the personal characteristics,

1    if I said that he was here illegally, I didn't mean to say
2    that.  I thought I said he's not a lawful permanent
3    resident.  My understanding is Mr. Aref's status is as a
4    refugee in the United States.  What I did want to point out
5    is sometime in the recent past, according to folks from the
6    Immigration and Customs Enforcement Service, Aref went in
7    and requested and completed an application for a travel
8    document in which he indicated that he intended in part to
9    travel to Iraq in December 2004 for three weeks.  We submit
10   that this shows his status as a refugee doesn't imperil his
11   act to travel and shows he's willing to travel and we submit
12   under the circumstances he's got great reason to travel.
13                  THE COURT:  Thank you.
14                  MR. GRABLE:  Thanks.
15                  THE COURT:  Mr. Kindlon, anything further?
16                  MR. KINDLON:  If I may just have a moment,
17   your Honor.  My client is saying something to me.
18                  (Pause.)
19                  MR. KINDLON:  My client says that he
20   understands that we have liberated Iraq, and he and his wife
21   wanted to go back there to see a sick relative, and as you
22   can see there by the documentation that Mr. Grable showed,
23   he was taking the appropriate steps and advising this
24   country of his intent to do so.  Again, I think that that
25   reinforces our position that my client is here to stay, does

UNITED STATES v AREF and HOSSAIN                63

1    not pose any risk of flight.  Thank you.

2                 THE COURT:  Mr. Luibrand, anything further?

3                 MR. LUIBRAND:  Nothing, your Honor.

4                 THE COURT:  Stand in recess for 15 minutes.

5                 (Brief recess at 3:35 PM.)

6                 (Court reconvened at 4:00 PM.)

7                 THE COURT:  There are times, and this is one,

8    when relatively new matters come before the Court.  This is

9    new because the spector of terrorism in the country is new.

10   And this case raises legal issues which must be decided on

11   legally competent evidence before the Court, setting aside

12   passion and the occasional prejudices which occur from time

13   to time.  I'm rewarded that counsel appear to have done that

14   in their exceptionally well prepared arguments and

15   presentations.  I hope to do the same.

16                 I've considered the arguments and

17   presentations of counsel.  The factors I must consider are

18   set forth in 18 USC Section 3142(g).  Those factors are

19   four, and the first is the nature and circumstances of the

20   offense.  Here, the offense charged is a mixed charge.

21   First it's money laundering, which, by its nature, is not

22   necessarily a crime of violence, but it also includes the

23   charges in counts, I believe it's 11 through 19, which

24   involves providing material support to terrorist

25   organization and, therefore, for purposes of bail, creates a

1    presumption that both defendants would pose a risk of flight

2    and danger to the community if released.  That presumption

3    there raises a burden of production but not persuasion on

4    the defense.  The burden of persuasion remains with the

5    Government, although persuasion remains a part of its case.

6                    The second factor is the weight of the

7    evidence.  The weight of the evidence in this case is much

8    in dispute.  It appears from the proffer of the United

9    States that the offenses in this case involved a government

10   informant who made contact with Mr. Hossain and, through a

11   series of transactions, to use the Government's words,

12   presented him with an opportunity to participate in the

13   obtaining and delivery of a weapon of mass destruction, a

14   surface to air missile.

15                    It further appears from the evidence that

16   Mr. Hossain obtained the participation of Mr. Aref to

17   witness the transaction in part at least in Mr. Aref's

18   capacity as the Imam of Mr. Hossain's mosque.

19                    There is no question, as defense counsel

20   state, that the offense in this case, it appears, was

21   suggested by the government informant and not by either

22   defendant.  This bears on several other factors I must

23   consider.  There's also no dispute from what the evidence

24   appears that it was clear to both defendants that the

25   transaction in question concerned a surface to air missile.

1   The missile itself was shown personally to Mr. Hossain.  The
2   trigger mechanism was shown to Mr. Aref; and the fact that
3   it was a trigger mechanism for a surface to air missile was
4   known to Mr. Aref.  Upon reading the complaint, the
5   description of the trigger mechanism could create a number
6   of images.  When you see a trigger mechanism, there's no
7   doubt as to what its purpose is and to what the destructive
8   capability in the context of the conversations is.  So while
9   it is true that the offense in this case was conjured by the
10  government and presented by a government informant, the
11  nature of the crime with which the defendants apparently
12  associated themselves was clearly one of violence and one of
13  massive proportions.

14          Whether or not they were predisposed to that
15  will ultimately be a question of fact for the jury, and I
16  find it difficult to assess that aspect of the case in an
17  affirmative defense such as entrapment or the claim of
18  Mr. Aref that he never even knew what the contract was about
19  without hearing the testimony, but I'm satisfied from the
20  evidence presented by the Government in its complaint and
21  search warrant affidavits and here in Court today that the
22  evidence is at least sufficient.  Whether I would describe
23  it as less than overwhelming because these cases, by their
24  nature, raise significant questions of fact for resolution
25  by the jury, sting operations have been ongoing for decades

1   in the country, going back to before Abscam, but certainly
2   during Abscam, DeLorean, and a number of other cases.  So
3   they're not unprecedented.  But, certainly, the evidence in
4   those cases generally, and in this case as well, is less
5   than overwhelming.

6               The third factor is the history and
7   characteristics of the defendants.  As to this factor, the
8   matters are -- the evidence is somewhat different for the
9   two defendants.  Mr. Aref is a native of Iraq, a resident
10  for four or five years in Syria, a resident in the United
11  States for five years.  I would describe the refugee status
12  as a legal resident but of undetermined duration.  And
13  certainly a conviction in this case for Mr. Aref creates a
14  certainty of deportation.  Mr. Aref is, as far as family
15  ties goes, is married and has three children in the area.
16  It appears he enjoys the support and respect of the people
17  in his community, particularly as the head of his mosque.
18  He has maintained steady employment and residence in the
19  United States.  It also appears as to Mr. Aref, however,
20  that there are a number of other factors which do not
21  support his claim for release on conditions.  Among other
22  things, his name with his Albany address and telephone
23  number were found in a notebook at a -- what is represented
24  to be a terrorist camp in northern Iraq within the last year
25  with what is represented to be the word "commander" written

1    next to it.  If true, that evidence carries significant
2    weight for Mr. Aref's connection to other terrorist
3    organizations.  I note that it is -- the Government's
4    attorneys as well rely on representations of others as to
5    what is contained in the notebook page.  Unless you are
6    unable to do so, I would direct you to provide a copy of the
7    page in question to Mr. Kindlon within seven days.  In
8    addition, however, as to Mr. Aref, it appears that he has
9    within the last year used a false name in sending out a
10   mailing from the post office.  It further appears that he
11   had a Syrian identification card which was good through 2007
12   in his possession at the time of the search of him and his
13   arrest.

14             As to Mr. Hossain, Mr. Hossain is a United
15   States citizen and has resided in the United States for
16   approximately 20 years.  He's married with five children
17   with whom he lives, has -- operates a business, owns rental
18   property and has otherwise done what anyone would expect and
19   hope that someone moving to this country would do to root
20   themselves in the life of this country and contribute to the
21   community.  As a matter of fact, if it were not for the
22   spector of terrorism, which hovers over this case, there
23   would probably -- and if this case involved what the
24   original plan was, for the purchase of false driver's
25   licenses, there would not even be a dispute about the

1   release of Mr. Hossain.

2           The final factor is whether or not the

3   release of any defendant would pose a danger to a particular

4   individual or to the community.  This is also one of the

5   bases on which the Government seeks detention.  The danger

6   to the community from both defendants arises, according to

7   the Government, first from the nature of the offense charged

8   here and from the fact that the offense charged here

9   includes laundering money to obtain a weapon of mass

10  destruction.  On the one hand, neither defendant suggested

11  the idea for that offense.  It came from the Government.

12  That, in itself, suggests to me that the danger to the

13  community, while it exists, may be addressable if that were

14  the only factor to consider.  The rest of it, however, is

15  that, as I noted before, the weapon of mass destruction, the

16  object of the conspiracy here was clearly known to both

17  defendants from the evidence proffered here, and as I noted

18  as to Mr. Aref, there is the connection to -- of some sort

19  to the terrorist camp in Iraq, his use of a false name and

20  his connections to foreign countries.

21          Having identified and articulated the factors

22  I must consider, I must now consider the grounds on which

23  the Government seeks detention of the two defendants.  The

24  first is danger to the community, and the second is risk of

25  flight.  And I must determine whether there are any

1   conditions which could be imposed which would address the

2   dangers which I have previously identified.  The options

3   include personal recognisance bonds, secured bonds, home

4   detention, electronic monitoring and other things identified

5   in 18 USC Section 3142.

6                 I will address the matter with respect to

7   Mr. Aref first.  As to danger to the community, there is

8   clearly a danger to the community which would arise from

9   Mr. Aref's release.  That danger arises not only from the

10  circumstances of this offense but from Mr. -- the fact of

11  the name in the notebook at a terrorist camp with the word

12  "commander" next to it, the willingness to use false names,

13  the relatively short duration of his life in the United

14  States, and his connection with foreign countries.

15                For all of those reasons, I find that

16  Mr. Aref's release would pose a significant danger to the

17  community and that the conditions which could be used to

18  address that are limited.  The property available is, in the

19  circumstances of this case, easily considered a cost of

20  doing business and, therefore, insufficient.  Electronic

21  monitoring is useful in certain cases, but in most instances

22  electronic monitoring is available only to tell us when

23  someone has left.  Someone with a mind to leave would have

24  no difficulty defeating electronic monitoring or home

25  detention.

UNITED STATES v AREF and HOSSAIN          70

1          So I find with respect to dangerousness, that

2    the Government has sustained its burden of proof as to

3    Mr. Aref and that there are no conditions which would

4    address that.

5          As to risk of flight with respect to

6    Mr. Aref, there is a similar significant danger of flight as

7    to him.  He faces the likelihood of deportation; probably a

8    certainty if he's convicted.  The evidence in this case is

9    strong, although not overwhelming, and given the penalty the

10   Government will seek based on its sentencing guidelines

11   computation, if Mr. Aref is found guilty, the motive to flee

12   is substantial and perhaps overwhelming in the circumstances

13   of this case.  For the same reason, therefore, the

14   conditions that are available to ensure against that danger

15   are insufficient to address the risk of flight as to

16   Mr. Aref in this case as well.  And I find that as to that

17   basis as well, the Government has sustained its burden.

18          As to Mr. Hossain, danger to the community,

19   the danger to the community articulated by the Government

20   arises solely from the circumstances of this case.

21   Mr. Hossain -- there is no evidence presented that

22   Mr. Hossain had any connection to any foreign terrorist

23   organization.  There's some evidence that he stated that he

24   belonged to a political party of some kind that is in a

25   foreign country, but that by itself would be insufficient to

1  support any claim of danger.  In the circumstances of this

2  case, the danger arises from his joining in an offense

3  suggested by the Government, his failure to turn away from

4  it; that not just a failure to turn away from it, but

5  willfully joining in it and continuing in it as suggested by

6  the Government.  There may be defenses to that.  That

7  depends on the evidence presented at trial.  And since

8  Mr. Hossain's counsel has been in this case for less than 24

9  hours, it's impossible for him to articulate at this point

10  all of the evidence that will be offered in support of that

11  defense.  Based on the record before me, I recognize that

12  there is a defense to the charge on that basis, but as to

13  danger to the community, that danger arises solely from a

14  crime which was suggested by the Government agent in this

15  case.  Mr. Hossain's crime, if any, was the agreement to

16  accept money from that person, put it through his own

17  account and give it back to that person in a different form.

18  That is an offense, but the danger was suggested by the

19  Government agent, not by Mr. Hossain, and he joined in it.

20  There is a danger to the community as to Mr. Hossain, I

21  find, but I also find that there would be conditions which

22  would adequately address that danger.  The risk of flight is

23  another matter, however.

24           As I noted with Mr. Aref, the charge in this

25  case is serious and carries with it a substantial penalty.

1   If the Government is correct, that penalty would include
2   imprisonment for 20 years or more upon conviction after
3   trial.  The evidence in the case is certainly sufficient to
4   present to a jury and a defense articulated by Mr. Hossain's
5   counsel is an affirmative defense which, by its nature, no
6   doubt requires resolution by a jury.  So the risks are great
7   for conviction.  Given those risks, the motive to flee is
8   substantial.  I also consider in this the fact that while
9   Mr. Hossain -- the offense charged against Mr. Hossain was
10  somewhat suggested by the Government agent, the nature of
11  the offense, one of the factors I must consider, was one
12  which involved a weapon of mass destruction.  Mr. Hossain
13  was not asked to turn away from, as I put it earlier, a trip
14  to Disneyland or a pound of cocaine, marijuana or a driver's
15  license.  This was a weapon of mass destruction which was
16  clearly presented to him and in which he clearly joined.  So
17  with respect to -- I do find that the nature of the offense
18  here supports the Government's claim as well that
19  Mr. Hossain would pose a danger to the community because it
20  strengthens the Government's case and, therefore, provides
21  motive.
22          On that basis, therefore, alone, I do find
23  that the Government has sustained its motion and an order as
24  to that effect as to both defendants will be entered.
25          Anything further, Mr. Grable?

UNITED STATES v AREF and HOSSAIN                73

1          MR. GRABLE:  Nothing on behalf of the
2     Government, your Honor.  Thank you.
3               THE COURT:  Mr. Kindlon?
4               MR. KINDLON:  No, thank you, Judge.
5               THE COURT:  Mr. Luibrand?
6               MR. LUIBRAND:  Nothing further, your Honor.
7               THE COURT:  Both defendants are remanded to
8     the custody of the United States Marshal.
9               THE CLERK:  Court stands in recess.
10              (Court adjourned at 4:15 PM.)
11                    - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

74

1          **C E R T I F I C A T I O N**

2

3

4               I, BONNIE J. BUCKLEY, RPR, Official Court

5   Reporter in and for the United States District Court,

6   Northern District of New York, do hereby certify that I

7   attended at the time and place set forth in the heading

8   hereof; that I did make a stenographic record of the

9   proceedings held in this matter and caused the same to be

10  transcribed; that the foregoing is a true and correct

11  transcript of the same and whole thereof.

12

13

14

15               BONNIE J. BUCKLEY, RPR

16               USDC Court Reporter - NDNY

17

18

19  DATED:  AUGUST 17, 2004

20

21

22

23

24

25

              UNITED STATES DISTRICT COURT REPORTER - NDNY
                       BONNIE J. BUCKLEY, RPR